UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| TRAVIS K. DIXON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Cause No. 1:14-cv-321 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Travis K. Dixon, on October 14, 2014. For the following reasons, the decision of the Commissioner is **REMANDED**.

*Background*

The plaintiff, Travis K. Dixon, filed an application for Child Disability Benefits and Supplemental Security Income on April 23, 2012, alleging a disability onset date of September 28, 2010. (Tr. 10). The Disability Determination Bureau denied Dixon's application on July 26, 2012, and again upon reconsideration on October 4, 2012. (Tr. 10). Dixon subsequently filed a timely request for a hearing on October 12, 2012. (Tr. 10). A hearing was held on April 30, 2013, before Administrative Law Judge (ALJ) Steven J. Neary, and the ALJ issued an unfavorable decision on June 27, 2013. (Tr. 10–21). Vocational Expert (VE) Sharon D. Ringenberg, David Dixon, Dixon's father, and Dixon testified at the hearing. (Tr. 10). The Appeals Council denied review on August 20, 2014, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–4).

The ALJ found that Dixon had not attained age twenty-two as of September 28, 2010, the alleged onset date. (Tr. 12). At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found that Dixon had not engaged in substantial gainful activity since September 28, 2010, the alleged onset date. (Tr. 13). At step two, the ALJ determined that Dixon had the following severe impairments: borderline intellectual functioning, mood disorder, and posttraumatic stress disorder. (Tr. 13).

The ALJ indicated that Dixon was obese at sixty-eight inches tall and 288 pounds, BMI of 43.8, in June 2012, and 292 pounds, BMI of 44.4, in February 2013. (Tr. 13). He also noted that Dixon's obesity caused shortness of breath on exertion occasionally. (Tr. 13). However, the ALJ did not find Dixon's obesity severely limiting because his physical examinations revealed few abnormalities. (Tr. 13). In June 2012, Dixon had full range of motion of the spine and his extremities, his lungs were clear, and he was not in acute distress. (Tr. 13). Dixon had no edema of his extremities, no gross motor deficits, no muscle weakness or pain, and no lumbar spine tenderness. (Tr. 13). He also had normal joint movement, could heel toe and tandem walk, had 5/5 strength in his bilateral upper extremities, and 5/5 grip strength bilaterally. (Tr. 13).

Dr. Thomas Miller assessed Dixon with obesity in November 2012 when he weighed 290 pounds. (Tr. 13). A February 2013 check-up revealed that Dixon was not in acute distress, his respiratory excursion was not diminished, his chest was normal to percussion, his lungs were clear to auscultation, and his heart rate and rhythm were normal. (Tr. 13). The ALJ did not find that Dixon's obesity caused more than minimal functional limitations because it did not cause significant respiratory, cardiovascular, or musculoskeletal limitations. (Tr. 13). Therefore, the ALJ did not include any exertional, postural, or environmental limitations in the RFC due to obesity. (Tr. 13).

The ALJ also found Dixon's right ear deafness nonsevere. (Tr. 13). A March 2006 audiogram revealed sensorineural hearing loss in Dixon's right hear and normal hearing in his left ear. (Tr. 13). In March 2010, Dixon's right ear was described as stable, and a June 2012, examination found no abnormal findings. (Tr. 13). Dr. Kamineni, a physical consultative examiner, found Dixon's speech normal but he had difficulty hearing conversations from his right side. (Tr. 14). The ALJ found that functional limitations were not warranted because Dixon had normal hearing in his left ear and did not have speech problems. (Tr. 14).

At step three, the ALJ concluded that Dixon did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 14). The ALJ stated that he considered the effects of Dixon's obesity on his other impairments. (Tr. 14). In determining whether Dixon had an impairment or combination of impairments that met the severity of one of the listed impairments, the ALJ considered Listing 12.02, organic mental disorders, Listing 12.04, affective disorders, and Listing 12.06, anxiety-related disorders. (Tr. 14). Additionally, he considered the Paragraph B criteria for mental impairments, which required at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Tr. 14). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 14).

The ALJ found that Dixon had a mild restriction in daily living activities. (Tr. 14). He noted that Dixon prepared meals, cared for his personal hygiene, watched television, mowed the lawn, cleaned, shopped for food and clothing, read, played sports, walked, and played video

3

games. (Tr. 14). The ALJ found that Dixon had moderate difficulties in social functioning. (Tr. 14). Dixon reported anger problems and had trouble getting along with others. (Tr. 14). Dixon also had poor eye contact and appeared restless during a psychological consultative examination. (Tr. 14). However, he spent most of his time with friends and got along well with his friends, father, and paternal grandparents. (Tr. 14). Dixon talked on the phone and participated regularly in religious activities. (Tr. 14).

The ALJ also found that Dixon had moderate difficulties in concentration, persistence, or pace. (Tr. 14). Dixon reported memory and concentration problems, trouble completing tasks, and difficulty handling stress. (Tr. 14–15). He could count change, follow instructions, and comprehend the consultative examiner's questions but needed reminders to take his medication. (Tr. 15). The ALJ found that Dixon did not have any episodes of decompensation of extended duration. (Tr. 15). Dixon did not satisfy the Paragraph B criteria because his mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration. (Tr. 15).

Additionally, the ALJ found that Dixon did not meet the requirements for Paragraph C. (Tr. 15). He indicated that Dixon did not have repeated episodes of decompensation and concluded that a marginal adjustment in mental demands or an environmental change would not cause Dixon to decompensate. (Tr. 15). The ALJ also stated that there was no evidence that Dixon could not function outside his home or a highly supportive living arrangement. (Tr. 15).

The ALJ then assessed Dixon's residual functional capacity (RFC) as follows:

> the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he cannot engage in complex or detailed tasks, but remains capable of simple routine tasks consistent with unskilled work; no contact with the public; no work in close proximity or cooperation with others.

(Tr. 15). The ALJ explained that in considering Dixon's symptoms he followed a two-step process. (Tr. 15). First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical and laboratory diagnostic technique that reasonably could be expected to produce Dixon's pain or other symptoms. (Tr. 15–16). Then, he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Dixon's functioning. (Tr. 16).

Dixon testified that he completed tenth grade and was attending classes to obtain a GED. (Tr. 16). He had done some work for family friends previously but was not working currently. (Tr. 16). Dixon stated that his PTSD, depression, and ADHD prevented him from working. (Tr. 16). He also had trouble sleeping because of bad dreams. (Tr. 16). Dixon reported that his depression made him feel sad and low and that it would make a work day difficult. (Tr. 16). His depression limited his motivation and caused him to isolate himself. (Tr. 16). Dixon stated that his ADHD caused hyperactivity and emotional highs and lows. (Tr. 16). He received mental health treatment at Northeastern Center and took several medications, which caused sleepiness. (Tr. 16–17).

Dixon believed that he could work with treatment. (Tr. 17). He also stated that he was physically able to work, despite having trouble breathing during exertion. (Tr. 17). Dixon spent time playing video games, playing the guitar, and attending religious activities. (Tr. 17). Although he did not have household chores, Dixon helped with yard work and cooking. (Tr. 17). Dixon's father testified that Dixon had angry outbursts, had trouble focusing, and that Dixon thought people talked about him. (Tr. 17).

The ALJ found that Dixon's medically determinable impairments reasonably could cause the alleged symptoms, but he found that Dixon was incredible regarding the intensity,

5

persistence, and limiting effects of the symptoms. (Tr. 17). He stated that the evidence did not support the severity of Dixon's impairments. (Tr. 17). The ALJ noted that Dixon was working towards a GED, denied symptoms reported by his therapist, reported a positive mood frequently, and intended to seek employment. (Tr. 17). The ALJ indicated that Dr. Timbrook found Dixon well informed about psychological terms and focused on his problems in a self-pitying manner. (Tr. 17). Dixon received special education services for emotional and math learning disabilities. (Tr. 17). When he dropped out of school in August 2011 to pursue a GED, school records showed an improvement in behavior issues but continued academic issues. (Tr. 17).

After an August 2011 psychological consultative examination, Dr. Davidson diagnosed Dixon with borderline intellectual functioning and a mood disorder. (Tr. 17). Dr. Davidson concluded that Dixon had an IQ of 73 and that Dixon tended to respond impulsively. (Tr. 17). He noted that Dixon did not have attention or concentration problems during testing and that Dixon was persistent. (Tr. 17). Dr. Davidson found that Dixon could understand, remember, and carry out simple tasks and maintain attention and concentration. (Tr. 17). However, he noted that Dixon struggled with those activities when Dixon felt pressured. (Tr. 17). Dr. Davidson also determined that Dixon expressed conflict with decompensation, which affected Dixon's social interactions. (Tr. 17).

Dixon received treatment at Northeastern Center for bipolar disorder, anxiety, and PTSD. (Tr. 17). Dixon reported having poor focus and a short temper in October 2011. (Tr. 17). However, he reported a positive mood and improved anger management in February 2012. (Tr. 17). Dixon also stated that he wanted to end his outpatient counseling and that he felt his family had forced him to continue treatment. (Tr. 17). July 2012 treatment notes indicated that finances caused Dixon's stress at home. (Tr. 17). Dixon's father reported that Dixon continued to have

outbursts, and Dixon's therapist stated his mood had worsened, despite Dixon's claims otherwise. (Tr. 17). Dixon claimed that his stress level had improved, that he was arguing less with family members, and that he intended to seek employment. (Tr. 18).

In July 2012, Dr. Rodney Timbrook found that Dixon's IQ was 79, which was within the borderline range of intellectual functioning. (Tr. 18). Dixon described memories of his mother threatening to run away with him. (Tr. 18). He was alert, cooperative, and mildly restless during the examination. (Tr. 18). Dixon knew and used psychological terms to describe his experience, despite being instructed to describe specific experiences, behaviors, and symptoms. (Tr. 18). He described his mood as "pretty normal" and "pretty happy," did not report any mood disturbance, and reported some mild anxiety and trouble sleeping. (Tr. 18). Dixon was fully oriented to date, place, and situation, his speech was connected normally, and Dr. Timbrook had to re-direct him occasionally during intelligence testing. (Tr. 18). Dr. Timbrook also found that Dixon had a GAF score of 65, which indicated some mild symptoms and functioning difficulty. (Tr. 18). Dr. Timbrook concluded that Dixon could perform work related duties that involved social interaction, understanding, and sustained concentration, memory, and persistence. (Tr. 18). He further found that Dixon could manage his own funds. (Tr. 18).

October 2012 to March 2013 treatment records from Northeastern Center demonstrated anxiety, agitation, temper issues, nightmares, tangential thoughts, and paranoia. (Tr. 18). Dixon reported that his low activity level worsened his depression, but his father reported improvement in Dixon's anger issues. (Tr. 18). Dixon was fully oriented, had a good attention span and concentration, and slept eight hours a night. (Tr. 18). Despite stating that he felt overwhelmed occasionally, Dixon continued to do well and hung out with friends on the weekend. (Tr. 18). A December 2012 mental examination showed a positive mood, friendly attitude, good eye contact

and speech, normal psychomotor activity, fair judgment and insight, and euthymic affect. (Tr. 18). Additionally, his GAF score had increased to 70, which indicated some mild symptoms or difficulty functioning. (Tr. 18).

Dixon was diagnosed with ADHD and prescribed Strattera at the Northeastern Center, but the ALJ did not find that the record supported more than minimal functional limitations from his ADHD. (Tr. 18). The ALJ noted that neither psychological consultative examiner diagnosed Dixon with ADHD. (Tr. 18). Dr. Timbrook indicated that Dixon had been diagnosed with ADHD and that some of his results were consistent with that diagnosis. (Tr. 18). However, he concluded that he could not make an ADHD diagnosis based on his examination and the limited information he received. (Tr. 18). In June 2012, Dixon informed Dr. Kamineni that his medication controlled his ADHD symptoms. (Tr. 18). The ALJ found that Dixon might experience some concentration deficits but concluded that the RFC accommodated any problems with ADHD. (Tr. 18). Therefore, the ALJ did not include additional limitations to address Dixon's ADHD. (Tr. 18). The ALJ also concluded that Dixon had some processing and social problems during his first psychological consultative examination but stated that Dixon's social skills had improved at the second examination. (Tr. 19). He noted that Dixon's IQ scores were consistent and within borderline intellectual functioning, despite some variability. (Tr. 19).

State agency psychologists found that Dixon could perform unskilled tasks after reviewing evidence of his mental impairments. (Tr. 19). An August 2011 State agency opinion restricted Dixon to brief, superficial interactions with co-workers, supervisors, and the public based on social limitations. (Tr. 19). The ALJ concluded that Dixon could perform simple, routine tasks, despite his cognitive impairments. (Tr. 19). However, the ALJ found that Dixon's mental impairments caused concentration and social deficits. (Tr. 19). Specifically, he noted

that Dixon had anger issues and concerns about people talking about him. (Tr. 19). Therefore, the ALJ precluded work with the public and work in close proximity or cooperation with others, which was more limited than the State agency assessment. (Tr. 19).

At step four, the ALJ found that Dixon had no past relevant work. (Tr. 19). Considering Dixon's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that Dixon could perform, including industrial cleaner (100 jobs regionally, 1,000 jobs in Indiana, and 50,000 jobs nationally), laundry worker (200 jobs regionally, 3,000 jobs in Indiana, and 150,000 jobs nationally), and landscape laborer (100 jobs regionally, 1,000 jobs in Indiana, and 60,000 jobs nationally). (Tr. 19–20).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62; *Jens v. Barnhart*, 347

F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §§ 404.1520, 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b), 416.920(b)**. If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if

the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e)**. However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

The ALJ applied the five-step sequential evaluation that applied to adults to Dixon's claims. Dixon filed his application for Child Disability Benefits on April 23, 2012, alleging a disability onset date of September 28, 2010. (Tr. 10). He was born on September 28, 1992. (Tr. 149). An individual over eighteen is eligible for child benefits if the disability began before he turned twenty-two. **20 C.F.R. § 404.350(a)(5)**. Here, Dixon alleged a disability starting the day he turned eighteen and he applied for benefits after he turned eighteen. Therefore, the adult disability rules applied to his Child Disability Benefits application. **20 C.F.R. § 416.924(f)** ("For the period starting with the day you attain age 18, we will use the disability rules we use for adults who file new claims.").

First, Dixon has argued that the ALJ failed to account for all of his impairments in the RFC. SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Although the ALJ does not need to discuss every piece of evidence, he cannot ignore evidence that undermines his ultimate conclusions. *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.") (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). "A decision that lacks adequate discussion of the issues will be remanded." *Moore*, 743 F.3d at 1121.

Dixon has argued that the ALJ failed to account for the hearing loss in his right ear in the RFC. The ALJ noted that Dixon was deaf in his right ear but concluded that the impairment was nonsevere. He stated that Dixon's right ear hearing loss was stable, that Dixon's left ear was within normal limits, and that Dixon's speech was normal. The ALJ also indicated that Dixon did not have auditory neuropathy, his temporal bones were normal, and his external ear canals

were normal. The ALJ mentioned that Dr. Kamineni found that Dixon had difficulty hearing conversations from his right side. However, the ALJ concluded that functional limitations were unnecessary because Dixon's left ear was within normal limits and his speech was normal. Moreover, the ALJ did not include any environmental limitations based on Dixon's hearing loss.

Dixon has indicated that the ALJ failed to consider Dr. M. Ruiz's opinion. Dr. Ruiz, a non-examining State agency reviewer, found that Dixon had profound hearing loss in his right ear. Therefore, Dr. Ruiz concluded that he should avoid concentrated exposure to noise, an environmental limitation. The ALJ did not discuss or even identify Dr. Ruiz's findings. The court cannot determine whether the ALJ even considered Dr. Ruiz's opinion. The ALJ did not need to discuss every piece of evidence, but he needed to confront evidence that did not support his conclusion. *See Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.") (citation omitted). Dr. Ruiz's opinion included an environmental limitation based on Dixon's hearing loss, which contradicted the ALJ's conclusion. Thus, the ALJ needed to confront Dr. Ruiz's opinion. Because the ALJ failed to discuss Dr. Ruiz's opinion, this issue requires remand.

Dixon also has argued that the ALJ failed to include a limitation based on his obesity in the RFC. The ALJ found that Dixon was obese and that he had shortness of breath on exertion occasionally. However, the ALJ concluded that Dixon's obesity caused minimal functional limitations because Dixon did not have significant respiratory, cardiovascular, or musculoskeletal findings on examination. Additionally, he noted that Dixon had no muscle weakness or pain, no gross motor deficits, and normal joint movement.

Dixon has claimed that the ALJ erred by rejecting his symptoms based entirely on the objective medical evidence. The Commissioner has indicated that the ALJ considered the

13

objective medical evidence and the opinion evidence, which concluded that Dixon's obesity did not cause any functional limitations. It is clear that the ALJ considered the opinion evidence, but the ALJ cited only the objective medical evidence when rejecting Dixon's limitation claims due to obesity. The ALJ did not cite nonmedical evidence, such as Dixon's daily activities, when rejecting this claim. Because this matter is being remanded on a separate issue, the ALJ may further consider Dixon's limitations due to obesity on remand.

Dixon has argued that the ALJ failed to consider his Oppositional Defiant Disorder in the RFC. Dixon was diagnosed with ODD in 2005. He has claimed that it caused his angry outbursts and tantrums. The ALJ did not discuss or mention Dixon's ODD specifically. However, he did note that Dixon had anger problems, including outbursts with family members. The ALJ indicated that Dixon's anger problems had improved at times but that he continued to have outbursts. To account for Dixon's anger problems, the ALJ precluded any work with the public and limited his work in close proximity or cooperation with coworkers.

Although the ALJ considered symptoms that were caused by Dixon's ODD and included social limitations based on his anger, it is not clear that the ALJ considered Dixon's ODD diagnosis. The Commissioner has indicated that the ALJ considered opinion evidence from reviewing doctors who were aware of Dixon's ODD. However, without the ALJ mentioning or discussing Dixon's ODD, this court cannot determine whether he considered Dixon's limiting symptoms fully. The ALJ should indicate why his social limitations accounted for Dixon's ODD on remand.

Additionally, Dixon has argued that the ALJ failed to account for his ADHD in the RFC assessment. The ALJ considered Dixon's ADHD and concluded that it did not cause more than minimal functional limitations. He indicated that neither psychological consultative examiner

14

diagnosed Dixon with ADHD. The ALJ also noted that Dixon reported that his medication controlled his ADHD symptoms. The ALJ limited Dixon to simple, routine tasks and concluded that further limitations were unnecessary.

Dixon has claimed that a limitation to simple, routine tasks would not account for his limitations in concentration. However, the ALJ cited Dr. Timbrook and Dr. Davidson, who concluded that Dixon could sustain concentration to complete work duties and could maintain concentration respectively. The ALJ discussed Dixon's ADHD adequately and built a logical bridge between the evidence and his conclusion. Nevertheless, because this matter is being remanded on a separate issue, the ALJ may further consider Dixon's ADHD on remand.

Next, Dixon has argued that the ALJ's credibility determination was patently wrong. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. ***Bates v. Colvin***, 736 F.3d 1093, 1098 (7th Cir. 2013); ***Schmidt v. Astrue***, 496 F.3d 833, 843 (7th Cir. 2007); ***Prochaska v. Barnhart***, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. ***Nelson v. Apfel***, 131 F.3d 1228, 1237 (7th Cir. 1997); ***Allord v. Barnhart***, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. ***Steele v. Barnhart***, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000); *see* ***Bates***, 736 F.3d at 1098.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. § 404.1529(a);** *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. § 404.1529(c);** *see Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1; *see* **Moore v. Colvin**, 743 F.3d 1118, 1125 (7th Cir. 2014) ("'[T]he ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence.'") (quoting *Indoranto*, 374 F.3d at 474); *Indoranto*, 374 F.3d at 474; **Carradine v. Barnhart**, 360 F.3d 751, 754 (7th

16

Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, she must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2; *see Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015) ("[A] failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal.") (citations omitted); *Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). A minor discrepancy, coupled with the ALJ's observations is sufficient to support a finding that the

17

claimant was incredible. *Bates*, 736 F.3d at 1099. However, this must be weighed against the ALJ's duty to build the record and not to ignore a line of evidence that suggests a disability. *Bates*, 736 F.3d at 1099.

Dixon has argued that the ALJ did not support his adverse credibility finding. The ALJ found that Dixon's impairments could cause his alleged symptoms, but he found Dixon incredible regarding the intensity, persistence, and limiting effects of his symptoms. Dixon has indicated that the ALJ concluded that the evidence did not support the alleged severity of his impairments. However, he has argued that the ALJ could not rely entirely on the objective medical evidence to support his adverse credibility finding. Dixon also argued that the opinion evidence did not support the ALJ's credibility finding. He claimed that the ALJ cited opinions that did not consider all of his impairments and that the opinions did not reach a valid credibility finding.

The Commissioner has argued that the ALJ relied sufficiently on the objective medical evidence, Dixon's daily living activities, and the opinion evidence to find Dixon incredible. She indicated that the ALJ relied on the state agency opinions, which found that Dixon could work and that Dixon was partially credible. She noted that three doctors found Dixon partially credible and that five doctors found that Dixon could work. The Commissioner also stated that the ALJ considered Dixon's daily living activities, which included playing sports, playing video games, mowing the lawn, watching television, walking, attending religious activities, and hanging out with friends. She has argued that Dixon's activities negated the severity of his allegations.

Although the ALJ could have further explained his credibility finding, it was not patently wrong. The ALJ found Dixon incredible regarding the severity of his limitations. It is clear that

18

the ALJ considered the objective medical evidence, Dixon's daily living activities, and the opinion evidence to find that Dixon was not disabled. The ALJ did not explain specifically why that evidence rendered Dixon incredible. However, the ALJ did identify discrepancies in Dixon's testimony. Dixon testified that his PTSD, depression, and ADHD prevented him from working. He stated that his depression eliminated his motivation to work and that it would make it difficult to complete a work day. Moreover, he claimed that his angry outbursts and trouble focusing would preclude any work. The ALJ indicated that Dixon also reported a positive mood, denied symptoms reported by his therapist, and was working toward a GED. Furthermore, the ALJ noted that Dixon intended to seek employment and admitted that he was physically able to work.

The ALJ minimally articulated his credibility finding and created a logical bridge from the evidence to his conclusion. He identified multiple discrepancies between the severity of Dixon's allegations and statements Dixon made during treatment. For example, the ALJ indicated that Dixon intended to seek employment and reported a positive mood, despite claiming that his depression precluded all work. However, because the court is remanding this matter on a separate issue, the ALJ may further support his credibility finding on remand. The ALJ could indicate specifically why Dixon's daily activities contradicted his allegations and explain further how the objective medical evidence did not support his claims.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED**.

ENTERED this 15th day of December, 2015.

/s/ Andrew P. Rodovich
United States Magistrate Judge